IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Hommer T. Mills, | ) | C/A No.: 1:13-792-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civil Rule 73.01(B) (D.S.C.), and the Honorable Timothy M. Cain's October 10, 2013, order referring this matter to United States Magistrate Judge Bruce Howe Hendricks for disposition. [Entry #15]. This matter was subsequently reassigned to the undersigned on June 4, 2014. [Entry #23]. The parties consented to a United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [Entry #12].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards.

For the reasons that follow, the court remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 8, 2005, Plaintiff filed an application for DIB in which he alleged his disability began on June 5, 2004.  Tr. at 70, 181–83.  His application was denied initially and upon reconsideration.  Tr. at 89–90, 100–01.  On September 3, 2008, Plaintiff amended his alleged onset date to December 31, 2007, to coincide with his 50th birthday.  Tr. at 286.  On September 12, 2008, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Richard L. Vogel.  Tr. at 35–49 (Hr'g Tr.).  The ALJ issued an unfavorable decision on October 8, 2008.  Tr. at 72-84.  On August 8, 2010, the Appeals Council issued an order remanding the case to the ALJ.  Tr. at 85.  On June 30, 2011, Plaintiff had a second hearing before ALJ Vogel.  Tr. at 52–67 (Hr'g Tr.).  The ALJ issued an unfavorable decision on July 13, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 14–32.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 25, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 53 years old at the time of the hearing.  Tr. at 52.  He completed the ninth grade and obtained a high school equivalency certificate.  Tr. at 36.  His past relevant work ("PRW") was as a skating rink manager and a beer distribution laborer. Tr. at 62.  He alleges he has been unable to work since December 31, 2007.  Tr. at 286.

2.    Medical History

Plaintiff presented to George F. Warren, M.D., on July 29, 2004, with complaint of right-sided low back pain.  Tr. at 318.  Plaintiff reported that he had injured his back while pulling a pallet jack at work on June 5, 2004.  *Id.*  Dr. Warren diagnosed right lumbar facet syndrome and recommended that Plaintiff remain on light duty status.  Tr. at 317.

Plaintiff presented to Timothy M. Zgleszewski, M.D., on September 20, 2004, regarding low back pain.  Tr. at 545–46.  Dr. Zgleszewski indicated that, based on his examination and Plaintiff's lack of improvement, he suspected a greater problem than a lumbosacral strain.  Tr. at 546.

Plaintiff followed up with Dr. Zgleszewski on October 1, 2004.  Tr. at 547–48.  He ruled out Plaintiff's lumbar Z-joints as the source of the problem, and indicated that he would next need to rule out the right SI joint.  Tr. at 548.  Dr. Zgleszewski scheduled Plaintiff for diagnostic SI joint injection and MRI of the lumbar spine.  *Id.*

MRI of the lumbar spine on October 14, 2004, indicated spondylosis of the lumbar spine, greatest at L4-5, where there was a mild diffuse disc osteophyte complex and a

superimposed central and left parasagittal disc herniation with moderate to severe facet hypertrophy.  Tr. at 549.  The MRI also indicated moderate spinal canal stenosis with moderate to severe bilateral lateral recess stenosis.  Tr. at 549–50.  Compression of the transiting L5 nerve root could not be excluded, but there was no definite compression of the exiting L4 nerve root.  Tr. at 550.

On October 26, 2004, Plaintiff followed up with Dr. Zgleszewski to review his MRI report.  Tr. at 551.  Dr. Zgleszewski indicated that it was most likely that Plaintiff's pain was emanating from the disc itself.  *Id.*  Plaintiff agreed to proceed with provocative lumbar discography.  *Id.*

Plaintiff followed up with Dr. Zgleszewski on December 6, 2004.  Tr. at 325.  Dr. Zgleszewski discussed with Plaintiff the findings of the post-discography CT scan and recommended that Plaintiff undergo intradiscal electrothermal annuloplasty ("IDEA") at L3-4 and L4-5.  *Id.*

On December 16, 2004, Plaintiff presented to R. Blake Dennis, M.D., for a second opinion regarding his lumbar spine.  Tr. at 319.  Dr. Dennis indicated that Plaintiff had a 40 to 50 % chance of obtaining relief with IDEA, but that he expected that Plaintiff would be more likely to experience continued pain and to require spinal fusion.  *Id.*  Dr. Dennis recommended that Plaintiff participate in a vigorous active rehab program; use anti-inflammatory medications; engage in aerobic conditioning; and return to work at a light duty level.  *Id.*  Plaintiff agreed to pursue Dr. Dennis's recommendations, and Dr. Dennis gave him a note to return to work at light duty for six hours per day and to progress to eight hours of light duty work four weeks later.  *Id.*

On December 21, 2004, Dr. Zgleszewski wrote a note to Plaintiff's file in which he acknowledged that Plaintiff had opted not to proceed with IDEA. Tr. at 324. Dr. Zgleszewski noted his disagreement with Dr. Dennis's opinion. *Id.* Dr. Zgleszewski wrote that Plaintiff was not a candidate for two-level fusion and noted that Plaintiff was at maximum medical improvement. *Id.* He indicated that Plaintiff was limited to lifting no greater than 20 pounds on an occasional basis and that he should avoid repetitive bending, lifting, or twisting. *Id.* He wrote that Plaintiff could sit for 30 to 60 minutes at a time, but must be able to change positions. *Id.* Dr. Zgleszewski noted that Plaintiff had no limitations with respect to walking, standing, or engaging in repetitive movements with his upper extremities. *Id.* He indicated that Plaintiff could not use his feet for repetitive motions. *Id.* Dr. Zgleszewski noted that the restrictions were permanent. *Id.* Dr. Zgeleszewski assessed a 12% impairment rating to Plaintiff's lumbar spine. *Id.*

On January 27, 2005, Plaintiff reported worsened significant right leg pain and worsened back pain to Dr. Dennis. Tr. at 398. Plaintiff complained that physical therapy had provided no improvement and had worsened his back pain. *Id.*

On January 28, 2005, and February 25, 2005, Thomas D. Wooten, Jr., M.D., administered epidural steroid injections to the L4-5 level of Plaintiff's spine. Tr. at 332, 336.

On February 15, 2005, Plaintiff complained to his primary care physician, David Apple, M.D., about experiencing depression. Tr. at 493. Dr. Apple prescribed Cymbalta and noted that Plaintiff may benefit from therapy with a psychologist. Tr. at 494.

MRI of Plaintiff's lumbar spine on April 11, 2005, indicated severe central canal stenosis at L4-5 on the basis of a left central protrusion with underlying disc bulge as well as facet arthropathy and ligamentum flavum thickening; mild spondylosis at L3-4 with facet arthropathy, but no significant stenosis; and moderate bilateral facet arthropathy at L5-S1 without significant disc bulge or protrusion.  Tr. at 416.

Plaintiff followed up with Dr. Dennis on April 14, 2005, to review MRI results. Tr. at 392.  He reported buttock and thigh pain, worsened with prolonged walking.  *Id.* Dr. Dennis recommended that Plaintiff proceed with nerve root canal and foraminal decompression and discectomy, but informed Plaintiff that his condition would likely require a lumbar fusion in the future.  *Id.*

On April 29, 2005, Plaintiff underwent bilateral L4-5 laminectomy and nerve-root canal foraminal decompression with discectomy.  Tr. at 370.

On October 4, 2005, Plaintiff reported to Dr. Dennis that his leg pain was resolved.  Tr. at 386.  Plaintiff complained of back pain, but Dr. Dennis indicated that he told Plaintiff that he would still have back pain after the surgery.  *Id.*  Dr. Dennis recommended that Plaintiff lift no more than 40 pounds.  *Id.*

Plaintiff underwent functional capacity evaluation by Jesse McGrady, P.T., on November 16, 2005.  Tr. at 554–59.  Plaintiff participated in work activities in the light and medium work categories, but he consistently complained of high pain levels of 7/10 to 8/10.  Tr. at 558.  He was unable to squat lift.  *Id.*  Mr. McGrady concluded that Plaintiff would not be able to "return to job types which require lifting and prolonged standing and walking." *Id.*

Plaintiff followed up with Dr. Dennis on November 22, 2005.  Tr. at 385.  Plaintiff complained of 7/10 pain, which Dr. Dennis indicated to be inconsistent with his clinical picture.  *Id.*  Dr. Dennis prescribed a chair-back brace, recommended that Plaintiff walk two miles per day, and instructed Plaintiff to follow up in three to four weeks.  *Id.*

Plaintiff fractured his left distal radius on December 10, 2005, after he lost his balance and fell down approximately three stairs.  Tr. at 362–66.

Plaintiff presented to Jerrold M. Buckaloo, M.D., on January 11, 2006, for consultation regarding his left wrist fracture.  Tr. at 528–29.  Dr. Buckaloo noted that x-rays dated January 4, 2006, demonstrated a distal radius ulnar styloid fracture with impaction and further displacement of the volar ulnar aspect of the distal radius involving the volar 50% of the lunate facet.  Tr. at 529.  On January 17, 2006, Dr. Buckaloo performed open reduction internal fixation with limited osteotomy of the left distal radius.  Tr. at 530.

Plaintiff presented to Dr. Dennis on March 14, 2006, to report that his right leg was giving way.  Tr. at 432.  Dr. Dennis indicated that the problem did not seem to be consistent with a lumbar spine problem and he referred Plaintiff for EMG and nerve conduction studies.  *Id.*

Plaintiff underwent EMG/nerve conduction studies of the bilateral lumbar paraspinals and lower extremities on April 6, 2006.  Tr. at 587–88.  The studies indicated slightly decreased recruitment pattern of the right lower extremity musculature.  Tr. at 588.  Chronic denervation potentials were noted, but no acute denervation potentials were identified.  *Id.*

On May 3, 2006, state agency consultant Jean Smolka, M.D., completed a physical residual functional capacity assessment. Tr. at 418–25. Dr. Smolka indicated the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; occasional heavy pushing and/or pulling with the left upper extremity; frequently climbing ramp/stairs, balancing, kneeling, and crouching; occasionally climbing ladder/rope/scaffolds, stooping, and crawling; and handling (gross manipulation) limited to frequent with the left upper extremity. Tr. at 419–21.

Plaintiff followed up with Dr. Dennis on May 9, 2006, and continued to complain that his right leg was weak and giving way. Tr. at 430. Dr. Dennis indicated that recent EMG and nerve conduction studies were negative. *Id.* He offered to refer Plaintiff to a neurologist to rule out any occult neurological problem. *Id.* Dr. Dennis indicated that Plaintiff had reached maximum medical improvement and he assigned Plaintiff a 20% impairment rating to the lumbar spine. *Id.*

On June 10, 2006, Plaintiff was examined by Charles J. Gudas, DPM, at the request of his workers' compensation attorney. Tr. at 599–600. Plaintiff complained of significant pain, irritation, and instability of his right lower extremity. Tr. at 599. He indicated that his leg gave out one to three times per week. *Id.* Dr. Gudas noted the following findings: moderate pain along the lateral aspect of the right foot, leg, and ankle; very significant +3 plantar fasciitis; +3 inferior heel pain on the right side; and antalgic gait with significant functional disturbance. *Id.* Dr. Gudas noted negative Babinski and

clonus, but observed decreased sensation in the lateral aspect of Plaintiff's right leg, consistent with lumbar spine derangement. *Id.* Dr. Gudas documented 4/5 muscle strength of the right lower extremity. *Id.* Plaintiff's right calf measured 36.5 centimeters in girth and his left calf measured 38 centimeters in girth. *Id.* Dr. Gudas measured a 2.4 centimeter difference in the lengths of Plaintiff's lower extremities. Tr. at 600. Dr. Gudas recommended that Plaintiff use an ankle stabilization device and a cane. *Id.*

Plaintiff complained to Dr. Apple on July 18, 2006, that his right leg was going out and that he was very depressed. Tr. at 491. Dr. Apple noted tenderness in Plaintiff's lumbosacral and low thoracic spine. Tr. at 492. He prescribed Cymbalta for depression and Ultram for pain. *Id.*

State agency consultant Judith Von, Ph.D., completed a psychiatric review technique on September 8, 2006. Tr. at 507–20. She considered Listing 12.04 for affective disorders in light of Plaintiff's treatment for depression. *Id.* She assessed Plaintiff's degree of limitation as mild with respect to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Tr. at 517. She determined that Plaintiff had no episodes of decompensation and that the evidence did not support the presence of the "C" criteria under the Listing. Tr. at 517–18.

On September 11, 2006, Plaintiff followed up with Dr. Buckaloo to receive an impairment rating for his left wrist. Tr. at 522. Dr. Buckaloo observed that Plaintiff's digit mobility was full and unrestricted. *Id.* Plaintiff's wrist flexion was 30 degrees; extension was 45 degrees; radial deviation was 15 degrees; and ulnar deviation was 25

degrees.  *Id.*  Dr. Buckaloo assessed an 11% impairment rating of the upper extremity. *Id.*

Dr. Stout administered EMG and nerve conduction studies on September 22, 2006. Tr. at 593–95.   The studies showed no evidence of peripheral neuropathy or radiculopathy.  Tr. at 594.

State agency consultant William Cain, M.D., completed a physical residual functional capacity assessment on September 25, 2006.  Tr. at 533–40.  He indicated that Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) about six hours in an eight-hour workday; sit (with normal breaks) about six hours in an eight-hour workday; occasional heavy pushing and/or pulling with the left upper extremity; frequently climbing ramp/stairs, balancing, kneeling, and crouching; occasionally climbing ladder/rope/scaffolds, stooping, and crawling; and frequent handling (gross manipulation) with the left upper extremity.  Tr. at 534–36.

Plaintiff followed up with Dr. Apple on December 1, 2006.  Tr. at 616.  He reported that his low back pain was continuing to limit his activities.  *Id.*  Dr. Apple observed palpable tenderness in Plaintiff's lumbosacral spine.  *Id.*  He also noted that Plaintiff had difficulty sitting for any length of time without shifting positions repeatedly and difficulty rising from a seated or supine position.  *Id.*  Straight-leg raise was negative. *Id.*

On December 4, 2006, Plaintiff was seen by Curtis Worthington, M.D., for a workers' compensation evaluation.  Tr. at 575.  Plaintiff reported that he was no longer

experiencing extremity pain. *Id.* Plaintiff indicated that he continued to experience low back pain, which bothered him 100% of the time. *Id.* Dr. Worthington observed some tenderness to palpation along the lower lumbar spinous process and limited mobility of Plaintiff's back. *Id.* Plaintiff's gait was normal and his lower extremity strength, sensation, and reflexes were intact. *Id.* Dr. Worthington recommended that Plaintiff resume use of anti-inflammatories and muscle relaxants, participate in physical therapy, and obtain epidural blocks. *Id.* Dr. Worthington also suggested that Plaintiff obtain a new MRI scan. *Id.*

Plaintiff visited J. Robert Alexander, Jr., M.D., for initial consultation on February 8, 2007. Tr. at 585–90. Plaintiff complained of lumbar pain and chronic right lower extremity weakness. Tr. at 585. Dr. Alexander observed tenderness to palpation segmentally at L3 through S1 bilaterally, right greater than left. *Id.* Plaintiff complained of increased lumbar pain with lumbar flexion, but not with extension. *Id.* Plaintiff had negative straight-leg raise bilaterally, but straight-leg raise did produce axial symptoms on the right. *Id.* Dr. Alexander administered bilateral lumbar paraspinal injections. Tr. at 586.

On February 16, 2007, Plaintiff reported to Dr. Alexander that he experienced some benefit after the last lumbar injection, but that his symptoms had returned. Tr. at 584. Dr. Alexander scheduled Plaintiff for repeat bilateral transforaminal epidural injection at L4. *Id.*

Plaintiff followed up with Dr. Alexander on March 13, 2007, and reported at least two weeks of benefit from bilateral transforaminal epidural steroid injection. Tr. at 582.

However, Plaintiff indicated that his symptoms were slowly returning.  *Id.*  Dr. Alexander

recommended repeat MRI.  *Id.*

MRI on March 23, 2007, indicated prior laminectomy at L4-5 on the right, with

central disc protrusion, deformity of the ventral thecal sac with minimal extension below

the superior endplate of L5 in the midline, and canal narrowing.  Tr. at 579–80.  The MRI

also indicated mild degeneration at L5-S1 and L3-4, but no disc herniation, canal

stenosis, or significant foraminal compromise.  Tr.at 580.

Plaintiff followed up with Dr. Alexander on April 26, 2007, and reported a recent

increase in lower extremity discomfort.  Tr. at 578.  Dr. Alexander noted tenderness in

Plaintiff's lumbosacral paraspinal region.  *Id.*  Dr. Alexander scheduled Plaintiff for

repeat bilateral transforaminal epidural steroid injection at L4.  *Id.*

On June 1, 2007, Plaintiff followed up with Dr. Alexander after a bilateral

transforaminal epidural steroid injection.  Tr. at 576.  Plaintiff reported decreased pain

from 8/10 to 4/10 and indicated that he had recently discontinued use of Neurontin and

Feldene.  *Id.*  Dr. Alexander noted that Plaintiff had decreased tenderness in his

lumbosacral paraspinal region.  *Id.*  Dr. Alexander recommended that Plaintiff resume

use of Neurontin and Feldene.  *Id.*

Plaintiff followed presented to neurologist Thomas F. Stout, M.D., on July 11,

2007, and complained of continued low back pain.  Tr. at 591–92.  Dr. Stout noted low

lumbosacral tenderness to palpation.  Tr. at 591.  Dr. Stout observed normal motor tone,

motor strength, reflexes, and sensation.  *Id.*  Dr. Stout diagnosed chronic pain syndrome,

also termed failed spine syndrome.  *Id.*  Dr. Stout recommended a medication regimen to Plaintiff and referred him to Dr. Apple for ongoing medication management.  Tr. at 592.

The record contains a July 26, 2007, letter written by Dr. Gudas to Linda C. Wesman, RN, who was the nurse case manager in Plaintiff's workers' compensation claim.  Tr. at 598.  Dr. Gudas indicated that Plaintiff had significant gait derangement, which would preclude him from walking, standing, climbing, or bending.  *Id.*  He noted that Plaintiff had neurologic dysfunction from his failed back surgery combined with a limb-length discrepancy, which affected bending, squatting, standing, walking, and jobs requiring weight bearing.  *Id.*  Dr. Gudas indicated that Plaintiff would not be able to climb or make sudden lateral or forward movements.  *Id.*  Dr. Gudas wrote that Plaintiff would likely have to sit for extended periods of time.  *Id.*

Plaintiff followed up with Dr. Apple on July 30, 2007.  Tr. at 613.  Plaintiff indicated that Cymbalta was working well for him and that he was socializing.  *Id.* Plaintiff reported being severely limited from his back.  *Id.*

On September 25, 2007, Dr. Gudas completed an activity restrictions checklist, indicating that Plaintiff was restricted as follows: occasionally lift and/or carry less than 10 pounds; no frequent lifting/carrying; never bend at the waist; stand and/or walk less than two hours in an eight-hour workday; use of cane for walking and for bending/stooping at all times; push and/or pull limited in lower extremities; sitting about six hours in an eight-hour workday; position changes every hour; frequent and/or unscheduled breaks every hour; alternate sitting and standing every hour; elevate legs every hour; occasionally reaching; occasionally using arms independently; occasionally

13

using repetitive hand/finger actions with both hands to manipulate and work with small objects; occasionally gripping and handling (gross manipulation); no heat or cold; no humidity or wetness; no vibration; no dust/odors/fumes; and limitation in ability to concentrate, remain alert, think clearly, or otherwise attend to work tasks to completion due to pain or other discomfort and fatigue.  Tr. at 596–97.

On October 31, 2007, Plaintiff attended an independent occupational evaluation with Barry Weissglass, M.D., M.P.H.  Tr. at 601–09.  Plaintiff complained of low back pain with radiation to the right leg and buttocks; left wrist pain and limited range of motion with weakness; and mood changes with depression, irritability, social withdrawal, and anhedonia.  Tr. at 605.  Dr. Weissglass noted that Plaintiff had no neurological abnormalities.  Tr. at 606.  He indicated that Plaintiff had appropriate affect with no unusual behaviors or disordered thought processes.  *Id.*  Dr. Weissglass observed full range of motion of all of Plaintiff's extremities except his left wrist, which had markedly diminished extension and flexion.  *Id.*  He also noted that Plaintiff's grip strength was significantly impaired.  *Id.*  Dr. Weissglass noted that Plaintiff had markedly decreased range of motion of the back and tenderness to palpation of the low back.  Tr. at 607.  Dr. Weissglass noted that Plaintiff had impaired abilities to bend, lift, twist, sit, and drive.  *Id.* He also indicated that Plaintiff's ability to use his left hand for repetitive activities was impaired.  *Id.*  He noted that Plaintiff's mood changes impaired his ability to maintain appropriate personal and working relationships.  *Id.*  Dr. Weissglass noted that Plaintiff should avoid bending or twisting; should avoid sitting or driving for more than 25 to 30 minutes at a time; would require frequent alternation of positions; should limit lifting to

14

15 to 20 pounds occasionally; should avoid repetitive heavy use of the left hand; and should avoid activities in which stressful interpersonal relations are predictable.  Tr. at 608.  Dr. Weissglass also stated "[t]hese injuries in combination have rendered Mr. Mills permanently and totally disabled to a reasonable degree of medical certainty."  *Id.*

On November 19, 2007, Plaintiff saw Dr. Apple for routine follow up.  Tr. at 611– 12.  Plaintiff reported continued back pain and depression.  Tr. at 611.  Dr. Apple observed tenderness, decreased range of motion of Plaintiff's lumbar spine, motor weakness, and unsteady gait.  Tr. at 612.  He also noted negative straight leg raise and intact reflexes.  *Id.*  He described Plaintiff's affect as flat and depressed.  *Id.*  Dr. Apple wrote "[p]atient is clearly in my opinion 100% disabled 2° to his work related injury.  Further, his depression, weight gain, and ED are directly consequential to this injury.  Encouraged to persist at attempts to obtain disability which I wholly believe he deserves."  *Id.*

Plaintiff followed up with Dr. Apple on February 19, 2008.  Tr. at 610.  Dr. Apple observed Plaintiff to have somewhat limited movement due to his back pain and tenderness in the lumbar spine.  *Id.*  Plaintiff indicated that he was taking Cymbalta and Neurontin, but that he was not taking his muscle relaxer or anti-inflammatory.  *Id.*

Plaintiff's attorney referred him for a psychological evaluation, which was performed by C. Barton Saylor, Ph.D., ABPP, P.A., on January 22, 2009.  Tr. at 620.  Dr. Saylor prepared a report dated February 16, 2009.  Tr. at 620–24.  Dr. Saylor assessed Plaintiff's full-scale IQ at 75; his verbal IQ at 76; and his performance IQ at 76.  Tr. at 622.  Dr. Saylor indicated that Plaintiff's physical condition caused him to develop

depression.  Tr. at 624.  However, he indicated, "[i]n my opinion, Tommy's affective disorder alone would not render him unable to work at least on a part-time basis.  Indeed it appears to me that he would feel less depressed if he could gradually be reintroduced into some form of productive daily activity, either vocational training, volunteer work, or actually paid employment."  *Id.*

On March 10, 2009, Plaintiff was evaluated for a second time by Dr. Weissglass. Tr. at 625–29.  Dr. Weissglass observed that Plaintiff shifted his weight continuously in his chair.  Tr. at 627.  He noted that Plaintiff had a mildly antalgic gait.  *Id.*  He described Plaintiff as having a somewhat flat and depressed affect, but indicated that he had no unusual behaviors or obviously disordered thought processes.  Tr. at 628.  Dr. Weissglass indicated that Plaintiff had full range of motion of all extremities except his left wrist, which had markedly diminished extension and flexion.  *Id.*  He described Plaintiff's grip strength as "significantly impaired."  *Id.*  Dr. Weissglass observed markedly decreased range of motion in Plaintiff's back.  *Id.*  He indicated that Plaintiff had low back pain with radiation to the right leg and buttocks, which "may be slightly worse than when last seen a year and a half ago."  *Id.*  He indicated that Plaintiff's left wrist was the same when he was last examined.  *Id.*  He noted that Plaintiff's mood changed appeared to have progressed since he was last examined.  *Id.*  Dr. Weissglass indicated that Plaintiff was impaired in his abilities to bend, lift, twist, sit, drive, and use his left hand for repetitive activities requiring significant prolonged use of force against resistance.  *Id.* He indicated that Plaintiff's mood changes impaired his ability to maintain appropriate and satisfactory relationships with friends, family, and others.  *Id.*  Finally, he stated "[t]o

a medical certainty, he is unable to perform any significant, gainful employment." Tr. at 629.

Dr. Weissglass also completed an examining physician's statement on March 10, 2009. Tr. at 630–36. Dr. Weissglass noted that Plaintiff's diagnoses included chronic low back pain secondary to work-related injury with associated radiculopathy to his right leg; left distal radius fracture with chronic pain, decreased range of motion, and loss of strength; and psychological impairment (depression and anxiety) associated with chronic pain. Tr. at 631. He indicated that Plaintiff was restricted as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; occasionally bend at the waist; stand and/or walk (with normal breaks) less than two hours in an eight-hour workday; unable to perform repetitive work with left upper extremity due to fracture of left distal radius; sit (with normal breaks) for less than two hours in an eight-hour workday; frequent position changes every 10 minutes; frequent and/or unscheduled breaks for relief of pain requiring worker to leave workstation every 15 minutes; alternate sitting and standing every 10 minutes; frequent reaching with the right arm; and occasional reaching with the left arm. Tr. at 632–34. Dr. Weissglass also noted that Plaintiff's ability to concentrate, remain alert, think clearly, or otherwise attend to work tasks to completion was limited by pain or other discomfort, fatigue, sleepiness, lightheadedness, mental disorder, and side effect of prescribed medication for 50% or more of workday or workweek. Tr. at 635. Dr. Weissglass indicated that Plaintiff could not return to his past relevant work; that he would be absent from work four or more days per month; that he could sustain no type of work activity at any exertional level due to

17

pain, fatigue, or other subjective symptoms; and that no significant improvement was expected.  Tr. at 636.

Plaintiff obtained treatment for his back pain and non-severe impairments from Hugh E. Thompson, M.D, after his date last insured.  Tr. at 684, 688, 690, 692.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    Hearing on September 12, 2008

At the hearing on September 12, 2008, Plaintiff testified that he was 50 years old. Tr. at 35.  He indicated that he attended school through the ninth grade and that he received a GED.  Tr. at 36.

Plaintiff testified that he managed a skating rink for approximately 17 years.  Tr. at 37.  Plaintiff indicated that he also worked for a beer distribution company for about ten years.  Tr. at 38.

Plaintiff testified that prior to his back surgery in April 2005, he was experiencing numbness in his right leg and that the leg was giving way.  Tr. at 39. Plaintiff testified that the surgery did not improve his back pain, but did improve the numbness in his right leg.  Tr. at 40.

Plaintiff testified that since age 50, he always experienced back pain, but some days were worse than others.  *Id.*  He indicated that he took Lortab twice a day on most days, but that he only took it before bed approximately two to three days per week.  Tr. at 41.  He testified that he felt a little drowsy after taking Lortab.  *Id.*

18

Plaintiff testified that he could sit in a chair for 30 minutes at a time and that he would sometimes lie down for 15 to 20 minutes a couple times a day.  Tr. at 41–42.

Plaintiff testified that he experienced two to three bad days per week in which he did not leave his house.  Tr. at 42.

Plaintiff testified that he sustained a fall in January 2007, in which his right leg gave out and he broke his left wrist.  *Id.*  Plaintiff testified that his leg no longer gave out. *Id.*  He indicated that he tried not to lift anything over 10 pounds with his left hand and that he had some weakness in his left hand when lifting.  Tr. at 43.

He indicated that his back pain increased if he engaged in prolonged standing and walking.  *Id.*  Plaintiff testified that he could sit for 30 minutes to an hour before needing to stand.  *Id.*

Plaintiff testified that he did not use a cane.  Tr. at 44.

Plaintiff testified that his depression was treated by his primary care physician, who prescribed Cymbalta.  *Id.*  Plaintiff indicated that his depression and sensitivity would affect his ability to work.  *Id.*  He testified that he became frustrated easily, that he was irritable, and that he was not motivated.  Tr. at 44–45.

## ii.     Hearing on June 30, 2011

At the hearing on June 30, 2011, Plaintiff testified that his back pain had neither improved nor worsened.  Tr. at 53.  Plaintiff testified that the pain was mostly in his lower back, but occasionally went down his leg and buttocks.  *Id.*  Plaintiff testified that his back pain was aggravated by bending down and lifting, being on his feet, and sitting in straight chairs.  Tr. at 54.  Plaintiff testified that he took Lortab and Flexeril for pain

and that his medication was prescribed by Dr. Thompson.  *Id.*  Plaintiff testified that the medication made him sleepy.  Tr. at 55.  Plaintiff indicated that he took the medications two to three times per day.  *Id.*

Plaintiff testified that his left wrist bothered him from time-to-time and that its strength was decreased.  Tr. at 56.

Plaintiff testified that he spent his days watching television and sitting by the pool across from his home for about thirty-minutes at a time.  Tr. at 57.  He testified that his cousin, who lived with him, performed the housework.  *Id.*  Plaintiff testified that he could not perform a job in which he would be standing for most of a workday.  Tr. at 58. He indicated that he could not sit upright for the majority of a workday.  *Id.*  Plaintiff testified that he tried not to lift anything heavier than a gallon of milk.  Tr. at 59.

Plaintiff testified that, in the beer distribution job, he moved beer from pallets to the coolers inside grocery stores and that he built displays.  Tr. at 59–60.  Plaintiff testified that, in the job at the skating rink, he handed out skates, mopped, vacuumed, swept, and performed other similar duties.  Tr. at 60.  He testified that he did not hire or fire employees or complete paperwork.  Tr. at 60–61.

b.    Vocational Expert Testimony

i.    Hearing on September 12, 2008

Vocational Expert ("VE") Arthur Schmitt, Ph.D., reviewed the record and testified at the hearing.  Tr. at 45–48.  The VE categorized Plaintiff's PRW as a skating rink manager as DOT number 187.167-146.  Tr. at 45.  The VE testified that the DOT classifies the position as SVP 6, but that he reclassified the job based on Plaintiff's

testimony as SVP 4 and light.  *Id.*  The VE categorized Plaintiff's other job as a beer distributing [clerk] as DOT number 222.587-018, which is classified as SVP 2 and light in the DOT, but which he would rate as SVP 3 and medium.  Tr. at 45–46.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who retained a light exertional capacity with no climbing or crawling; a sit/stand option at will; a low-stress setting with no more than occasional decision-making or changes in the setting; and no constant fingering and handling with the non-dominant hand.  Tr. at 46.  The VE testified that the hypothetical individual could perform jobs as a tobacco sampler, DOT number 529.587-022, which was unskilled, SVP 2, and light with 2,684 jobs in the state and 96,600 nationally; a storage facility clerk, DOT number 295.367-026, which was unskilled, SVP 2, and light with 2,522 jobs in the state and 227,000 nationally; and carton packer/machine tender, DOT number 920.665-010, which was unskilled, SVP 2, and light, with 12,040 jobs in the state and 165,490 jobs nationally.  *Id.*

Plaintiff's attorney asked the VE what break periods were typically allowed in the jobs identified.  Tr. at 47.  The VE responded that typical breaks were 15 minutes in the morning, 15 minutes in the afternoon, and 30 minutes to an hour for lunch.  *Id.*  Plaintiff's attorney asked if it would affect his ability to perform those jobs if a worker had to take breaks more frequently or at different times than the scheduled breaks.  *Id.*  The VE testified that unscheduled and frequent breaks would eliminate those jobs and any other jobs in the national economy.  *Id.*  Plaintiff's attorney then asked if a worker was suffering from difficulty concentrating due to pain, side effects of medication, or any other problem at least on some days out of a week, what percentage of the time would be

considered unacceptable on the jobs identified in response to the first hypothetical. Tr. at 47–48. The VE indicated that anything over 20% of a workday would be unacceptable. Tr. at 48.

ii.     Hearing on June 30, 2011

Dr. Schmitt again reviewed the record and testified at the hearing. Tr. at 62–66. The VE identified Plaintiff's PRW as manager, skating rink, DOT number 187.167-146. Tr. at 62. The VE indicated that the DOT classified the job as SVP 6, skilled, and light, but that he reclassified it based on Plaintiff's testimony as SVP 3, semi-skilled, and medium. *Id.* The VE identified Plaintiff's other PRW as spare man beer distributor/ laborer, DOT number 869.664-014, which was SVP 3, semi-skilled, and heavy. *Id.* The ALJ asked if there would be any transferable skills from those jobs to other jobs with SVP of 3. *Id.* The VE indicated that there would not. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who retained light exertional capacity, with no climbing, crawling, or exposure to industrial hazards; a sit-stand option at will; and a low stress setting with no more than occasional decision making or changes in the setting. Tr. at 62–63. The ALJ asked the VE to identify unskilled light work that was consistent with that vocational profile. Tr. at 63. The VE identified tobacco sampler, DOT number 529.587-022, which was unskilled with a SVP of 2 and light, with 8,800 jobs in South Carolina and 430,000 nationally; storage facility clerk, DOT number 295.367-026, which was unskilled with a SVP of 2 and light, with 4,400 jobs in South Carolina and 416,000 nationally; and ticket taker, DOT number 344.667-010, which was

unskilled with a SVP of 2 and light, with 1,260 jobs in South Carolina and 104,000 nationally. *Id.* The VE testified that his testimony was in accordance with the DOT. *Id.*

Plaintiff's attorney asked the VE to add to the hypothetical question the following restrictions:  a need to change positions every 10 minutes; unscheduled breaks requiring the worker to leave the work station every 15 minutes; and alternation of sitting and standing every 10 minutes.  Tr. at 64.  Plaintiff's attorney asked if the additional restrictions would significantly affect the ability to perform those jobs. *Id.* The VE responded that the unscheduled breaks would eliminate those jobs and any other jobs in the national economy. *Id.* Plaintiff's attorney asked if limiting reaching with the left non-dominant arm to occasional would significant affect the VE's response to the ALJ's hypothetical. *Id.* The VE testified that it would not. *Id.* Plaintiff's attorney asked the VE what percentage of the workday or work week spent off task would preclude work. Tr. at 65.  The VE responded "20 %."  Plaintiff's attorney asked the VE how much absenteeism was generally tolerated on jobs like those cited. *Id.* The VE testified "no more than three days per month." *Id.*

### 2.    The ALJ's Findings

In his decision dated July 13, 2011, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2009.
2.    The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of December 31, 2007, through his date last insured of December 31, 2009 (20 C.F.R. § 404.1571 et. seq.).

3.    Through the date last insured, the claimant had the following severe impairments: status post lumbar surgery and depression (20 C.F.R. § 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, and 404.1526.

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b). Specifically, the claimant could lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour workday.  However, the claimant climb, crawl, or be exposed to industrial hazards.  Additionally, the claimant required the option to sit and stand at will.  He could work only in a low-stress environment, defined as requiring no more than occasional decision-making or changes in the work setting.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.    The claimant was born on December 31, 1957 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 C.F.R. §  404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpt. P., Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 31, 2007, the amended alleged onset date, through December 31, 2009, the date last insured (20 C.F.R. § 404. 1520 (g)).

Tr. at 19–31.

D.    Appeals Council Review

Plaintiff filed a request for review of hearing decision/order dated August 11, 2011.  Tr. at 10.  The Appeals Council denied Plaintiff's request for review by notice dated February 8, 2013.  Tr. at 1–3.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    The ALJ's evaluation of the medical evidence was reached through misapplication of the governing legal standards and his RFC findings, which were based on outdated medical opinions, were not supported by substantial evidence;

2)    The ALJ erred by failing to properly consider all of Plaintiff's medically determinable impairments, both individually and in combination, at step two of the sequential evaluation and in making his RFC findings; and

3)    The ALJ improperly evaluated Plaintiff's credibility concerning allegations of back pain.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for
at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982).  The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the

findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

    1.     Medical Opinions and Findings of Drs. Gudas, Weissglass, and
           Apple

"Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment

relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654.  In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d, 585, 589 (4th Cir. 1996).

a.    Drs. Gudas's and Weissglass's Findings and Opinions

Plaintiff argues that the ALJ erred in rejecting the opinions of Drs. Gudas and Weissglass that Plaintiff's impairments worsened over time and limited him to work at or below the sedentary exertional level.  [Entry #13 at 20].  Plaintiff argues that the ALJ failed to cite current medical evidence to support his conclusions, instead relying on outdated evidence.  Entry #13 at 20–21].  Plaintiff contends that the ALJ should have accepted the findings and opinions of Drs. Gudas and Weissglass because he did not call a medical expert or obtain additional evidence to more fully develop the record.  [Entry #13 at 27–28].

The Commissioner argues that the ALJ provided adequate reasons for rejecting the opinions of Drs. Gudas and Weissglass.  [Entry #16 at 27–28].  The Commissioner argues that Plaintiff sought only minimal treatment for his "allegedly disabling impairments" during the relevant period.  [Entry #16 at 22].  The Commissioner contends

that, because the evidence was sufficient for the ALJ to make a decision, the ALJ was not required to order a consultative examination.  [Entry #16 at 15].

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p.  However, "[a] non-treating source is 'a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you.'"  *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) citing 20 C.F.R. § 404.1502 (finding that the ALJ properly determined that a physician who examined claimant once at the behest of claimant's attorney was a non-treating source).  Non-treating source opinions are not entitled to controlling weight, but "the ALJ must follow SSA rules requiring consideration of the background and expertise of the experts, the supporting evidence in the record for the opinions and consistency of the opinions."  *Bryant ex rel. Bryant v. Barnhart*, 63 Fed. Appx. 90, 95 (4th Cir. 2003) citing SSR 96-6p.

Other Circuits have held that "where there is no competing evidence, the ALJ is not permitted to substitute his opinions for those of the examining doctors."  *Grecol v. Halter*, 46 Fed. Appx. 773 (6th Cir. 2002) (remanding the case for consideration of Plaintiff's psychological condition where there was no evidence that Plaintiff's examining doctor's opinion was incorrect); *see also Ness v. Sullivan*, 904 F.2d 432 (8th Cir. 1990) (finding that the ALJ erred by substituting his observation that Plaintiff did not appear to be depressed or unhealthy during the hearing for the opinion of Plaintiff's doctor that Plaintiff was suffering from depression); *Ramos v. Barnhart*, 60 Fed. Appx.

334, 336 (1st Cir. 2003) (concluding that the ALJ substituted his own lay opinion for the uncontroverted medical evidence where the ALJ concluded that Plaintiff did not have an impairment that was diagnosed by two examining physicians and not rejected by any examining physician).  While the Fourth Circuit has not directly stated this proposition, the court has reversed and remanded the case where the ALJ substituted his opinion for the uncontradicted opinion of an examining physician.  *See Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) (finding that the ALJ substituted expertise he did not possess in the field of orthopedic medicine for the opinion of an examining physician that was supported by the findings of a treating physician).

The Fourth Circuit has held that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record . . . ." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  "Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980) (finding that the ALJ failed to properly develop the record where claimant was unrepresented and ALJ failed to obtain records from claimant's treating physician after promising claimant that he would).

The ALJ indicated that he gave little weight to the opinions of Dr. Gudas "because they were rendered several months prior to the claimant's amended alleged onset date and because there is no objective evidence from the relevant time period to support them."  Tr. at 27.  The ALJ notes that Dr. Gudas examined Plaintiff in June 2006 and set

forth the limitations over a year later without indicating that he examined Plaintiff in the interim. *Id.*

The ALJ indicated that he gave some weight to Dr. Weissglass's October 2007 opinion, but that "claimant's failure to seek medical attention for his left hand pain during the period in question renders Dr. Weissglass's restriction on the left hand use less persuasive." *Id.*  The ALJ noted that, with the exception of Dr. Weissglass's restrictions on bending and twisting, Dr. Weissglass's remaining opinions are generally consistent with the objective evidence from the relevant period and have been given some weight in limiting the claimant to a reduced range of light work in a low-stress setting." Tr. at 28. On the other hand, the ALJ noted that he accorded "little weight" to Dr. Weissglass's March 2009 opinions because he was a non-treating physician who had limited contact with Plaintiff; because he cited no new clinical abnormalities to support his conclusion that Plaintiff's symptoms had progressively worsened; because Plaintiff failed to seek more than occasional treatment for his back pain from the alleged onset date through the date last insured; and because his opinion was inconsistent with other evidence from the period at issue. *Id.*

Both Drs. Gudas and Weissglass examined Plaintiff.  They were not treating physicians, so their opinions were not entitled to controlling weight.  However, they both conducted thorough examinations of Plaintiff that yielded significant objective findings. During the June 10, 2006, examination, Dr. Gudas set forth numerous objective findings including antalgic gait, decreased sensation in the lateral aspect of Plaintiff's right leg, 4/5 muscle strength in Plaintiff's right lower extremity, a 1.5 centimeter difference in calf

girth between left and right, and a 2.4 centimeter leg-length discrepancy. Tr. at 599–600. During the October 31, 2007 examination, Dr. Weissglass observed that Plaintiff had markedly decreased flexion and extension of the left wrist, decreased grip strength, markedly decreased range of motion of the low back, and tenderness to palpation of the low back. Tr. at 606. During the March 10, 2009, examination, Dr. Weissglass made the following observations with respect to Plaintiff's impairments: mildly antalgic gait; markedly decreased flexion and extension of the left wrist; significantly impaired grip strength; and markedly decreased range of motion in the back. Tr. at 627–28.

Drs. Gudas's and Weissglass's observations and parts of their opinions were also supported by other evidence in the record. On November 16, 2005, physical therapist Jesse McGrady conducted a functional capacity evaluation and concluded that Plaintiff would not be able to "return to job types which require lifting and prolonged standing and walking." Tr. at 558. Dr. Buckaloo noted decreased range of motion of Plaintiff's left wrist when he released Plaintiff from his care on September 11, 2006. Tr. at 522. Approximately one month before he was examined by Dr. Gudas, Plaintiff complained to Dr. Dennis that his right leg was weak and giving way. Tr. at 430. A little over a month after being examined by Dr. Gudas, Plaintiff complained to Dr. Apple that his right leg was going out. Tr. at 491. Plaintiff was again complaining of extremity weakness when he presented to Dr. Alexander on February 8, 2007. Tr. at 585. Plaintiff reported a recent increase in lower extremity discomfort to Dr. Alexander on April 26, 2007. Tr. at 578. Less than a month after Plaintiff's first examination by Dr. Weissglass, he complained to Dr. Apple of back pain. Tr. at 611. Dr. Apple observed tenderness,

decreased range of motion of Plaintiff's lumbar spine, motor weakness, and unsteady gait.  Tr. at 612.  In February 2008, Dr. Apple observed tenderness in Plaintiff's lumbar spine and somewhat limited movement.  Tr. at 610.  Plaintiff also complained of back pain after his date last insured.  Tr. at 684, 688, 690, 692.

The ALJ indicated that Drs. Gudas's and Weissglass's opinions were not consistent with other opinions.  While it is correct that Drs. Gudas and Weissglass indicated greater physical restrictions than other physicians who treated Plaintiff earlier, the record suggests that Plaintiff's back pain and lower extremity symptoms worsened after those opinions were rendered.  Plaintiff's condition was expected to worsen over time, as evidenced by the fact that before his surgery in 2005, Dr. Dennis warned Plaintiff that he would likely require lumbar fusion surgery in the future.  Tr. at 392.  Drs. Warren and Zgleszewski imposed limitations before Plaintiff's surgery and more than three years before his alleged onset date.  Dr. Dennis's opinion was rendered more than two years before the alleged onset date and before Plaintiff pursued pain management treatment with Dr. Alexander.  Drs. Gudas and Weissglass also indicated greater restrictions than the state agency consultants, but the state agency consultants did not examine Plaintiff and rendered their opinions more than a year before Dr. Weissglass examined Plaintiff for the first time.

Drs. Gudas and Weissglass were also specialists in their fields.  Dr. Gudas was a podiatrist and reconstructive foot surgeon who served as a clinical professor of medicine.  Tr. at 598.  Dr. Weissglass was board certified in occupational medicine.  Tr. at 629.

The undersigned finds that the ALJ should have accorded greater weight to the opinions of Drs. Gudas and Weissglass based on the criteria set forth for evaluating opinion evidence.  The undersigned is not suggesting that Drs. Gudas's and Weissglass's opinions are entitled to controlling weight, but is instead indicating that the ALJ should have considered the uncontroverted elements of their opinions apart from the features that conflicted with other evidence in the record.  The ALJ should have also considered their uncontroverted objective findings apart from their opinions.

The undersigned also finds that the ALJ erroneously substituted his opinion for those of the examining doctors.  Where, as here, the ALJ disagrees with the findings of an examining physician, he must develop the record to support his conclusion.  The reports from Dr. Gudas's examination and Dr. Weissglass's first examination were in the record prior to the September 12, 2008, hearing.  The ALJ could have easily referred Plaintiff for a consultative examination before or after that hearing in order to obtain objective evidence to either support or refute the findings of Drs. Gudas and Weissglass.  Because the ALJ failed to avail himself of the opportunity to further develop the record, Drs. Gudas's and Weissglass's objective findings must be treated as uncontroverted evidence.

b.    Dr. Apple's Opinion

Plaintiff argues that the ALJ failed to address the opinion of Plaintiff's treating physician, Dr. Apple.  [Entry #13 at 29].  The Commissioner counters that Dr. Apple's statement was not a medical opinion, but an administrative finding reserved to the Commissioner, and because the ALJ cited to that reason for rejecting part of Dr.

Weissglass's opinion, his failure to address Dr. Apple's statement was harmless.  [Entry #16 at 29].

On November 19, 2007, Dr. Apple wrote "[p]atient is clearly in my opinion 100% disabled 2° to his work related injury.  Further, his depression, weight gain, and ED are directly consequential to this injury.  Encouraged to persist at attempts to obtain disability which I wholly believe he deserves." *Id.*

The ALJ did not address Dr. Apple's opinion in his decision.

"Opinions on some issues . . . are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. § 404.1527(d).  "Opinions that you are disabled" are among those reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1).  The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3).   However, "[t]he adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination of disability, including opinions from medical sources about issues reserved to the Commissioner." SSR 96-5p.  "If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.  *Id.*

20 C.F.R. § 404.1527 requires that the adjudicator address opinions of treating sources as follows:

> [T]he notice of the determination or decision must contain specific reasons
> for the weight given to the treating source's medical opinion, supported by

the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

The undersigned finds that Dr. Apple's statement was an opinion on an issue reserved to the Commissioner, but that the ALJ erred in failing to address the opinion in accordance with 20 C.F.R § 404.1527 and SSRs 96-2p and 96-5p. Dr. Apple was Plaintiff's treating physician. Therefore, his opinion was required to be considered in a very specific manner. SSR 96-2p requires that the notice of decision specifically address the opinion of a treating physician and clearly state the weight given the opinion and the reasons for that weight. By neglecting to address Dr. Apple's opinion, the ALJ ignored the express requirements of SSR 96-2p.

The undersigned rejects the Commissioner's argument that the ALJ did not have to address Dr. Apple's opinion because he addressed a similar statement made by Dr. Weissglass. Dr. Weissglass's opinion is distinguishable from Dr. Apple's opinion in that Dr. Weissglass was not a treating physician. The requirements of SSR 96-2p did not have to be followed with respect to Dr. Weissglass's opinion, but they did have to be followed with respect to Dr. Apple's opinion.

2.    Consideration of Combination of Impairments

Plaintiff argues that the ALJ erred in failing to determine that Plaintiff's leg-length discrepancy and left wrist impairment were severe impairments. [Entry #13 at 30]. Plaintiff further argues that the ALJ failed to consider the combined effects of all of Plaintiff's impairments and symptoms. [Entry #13 at 31].

The Commissioner argues that the Plaintiff's leg length and muscle strength discrepancies were not severe. [Entry #16 at 14]. The Commissioner also argues that the Plaintiff's wrist injury was not a severe impairment and that the ALJ did not err in failing to determine it to be a severe impairment in his second decision, even though he found it to be severe in his first decision. [Entry #16 at 15–16]. The Commissioner contends that the ALJ considered all of Plaintiff's impairments in determining the RFC. [Entry #16 at 16].

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508. Determination of severity of claimant's impairment is "[a] de minimis hurdle in [the] disability determination process," meant to expedite just settlement of claims by "screening out totally groundless claims." *Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008).

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining

the claimant's disability status.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments).  The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B) (2004).  The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."  *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."  *Id.*

The ALJ concluded that "there is no evidence that the claimant's status post left wrist fracture and surgery more than minimally affected his ability to perform work-related activity from his amended alleged onset date through his date last insured.  Tr. at 20.  With respect to claimant's leg-length discrepancy, the ALJ indicated "[a]lthough the claimant's leg length discrepancy was noted in July 2007, other examining physicians have failed to note this condition on a regular basis, suggesting that it does not impose more than minimal functional limitations."  Tr. at 21.

The ALJ mischaracterized Plaintiff's testimony and the medical evidence to support his conclusion that the left wrist impairment and leg-length discrepancy were non-severe impairments.  First, the ALJ indicated that Dr. Buckaloo "noted the claimant demonstrated excellent digit mobility with good flexion, extension, pronation, and supination of the left wrist/hand."  Tr. at 20.  In fact, Dr. Buckaloo concluded that

Plaintiff's digit mobility was full and unrestricted, but his wrist range of motion was restricted to 30 degrees of flexion, 45 degrees of extension, 15 degrees of radial deviation, and 25 degrees of ulnar deviation. Tr. at 522. As Plaintiff's attorney points out, these are reduced ranges of motion according to the American Medical Association's *Guides to the Evaluation of Permanent Impairment*, which cites normal wrist flexion and extension to be 60 degrees, normal radial deviation to be 20 degrees, and normal ulnar deviation to be 30 degrees. [Entry #13 at 36] citing *Guides to the Evaluation of Permanent Impairment*, 67–68 (5th Ed. 2004). Second, the ALJ indicated that an examining physician documented no abnormalities of Plaintiff's wrist in February 2008. The undersigned has reviewed Dr. Apple's February 19, 2008, visit note. Tr. at 610. While the ALJ is technically correct that Dr. Apple documented no abnormality of Plaintiff's wrist, there is also no indication that Dr. Apple checked the range of motion or function of Plaintiff's wrist during that or any other visit. Third, the ALJ indicated that Plaintiff indicated at the hearing that he rarely experienced left wrist pain. Tr. at 20. In fact, during the September 12, 2008 hearing, Plaintiff testified that he tried not to lift anything over 10 pounds with his left hand and that he had some weakness in his left hand when lifting. Tr. at 43. At the June 30, 2011 hearing, Plaintiff testified that his left wrist bothered him from time-to-time and that its strength was decreased. Tr. at 56. Fourth, the ALJ indicated that other physicians failed to note Plaintiff's leg-length discrepancy. Tr. at 21. While this is technically correct, the record does not indicate that any other physician measured Plaintiff's leg length. Furthermore, Dr. Apple noted

unsteady gait on November 19, 2007, which is a symptom consistent with a leg-length discrepancy.  Tr. at 612.

The undersigned finds that the ALJ did not consider the combined effects of all of Plaintiff's impairments in determining Plaintiff's RFC.  The ALJ made no mention of Plaintiff's leg-length discrepancy or any limitations imposed by it after finding it to be a non-severe impairment at step two.  The ALJ did mention Dr. Weissglass's assessment of Plaintiff's left wrist limitations, but concluded that "the limitation on repetitive, 'heavy' use of the left hand is not inconsistent with the above residual functional capacity."  Tr. at 28.  However, the undersigned notes that the RFC outlined by the ALJ contains no restrictions regarding use of Plaintiff's left upper extremity other than the restrictions set forth with regard to lifting and carrying.

The undersigned finds that substantial evidence supported a finding that Plaintiff's wrist impairment and leg-length discrepancy were severe impairments that imposed more than minimal restrictions on Plaintiff's ability to work.  The undersigned further finds that the ALJ failed to consider the combined effects of all of the Plaintiff's impairments in determining Plaintiff's disability status.

### 3.     Plaintiff's Credibility

Plaintiff argues that the ALJ erroneously evaluated Plaintiff's credibility because he relied on the fact that Plaintiff had received infrequent and sporadic medical treatment, but failed to give Plaintiff an opportunity to explain the reasons for his infrequent treatment.  [Entry #13 at 38–39].  Plaintiff further argues that Plaintiff's explanation for his failure to receive regular treatment was new and material evidence that should have

41

been considered in determining whether the ALJ's decision was supported by substantial evidence. [Entry #13 at 39].

The Commissioner argues that the objective medical evidence was inconsistent with the degree of symptomatology Plaintiff alleged. [Entry #16 at 30]. The Commissioner also argues that Plaintiff's non-compliance with treatment undermined his credibility. *Id.* Finally, the Commissioner contends that the ALJ permissibly relied on the inconsistency between claimant's level of treatment and his claims of disabling pain. [Entry #16 at 31].

Frequency and consistency of treatment should be considered by the ALJ when making a credibility determination.

> [T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.

SSR 96-7p.

The undersigned finds that the ALJ's determination regarding Plaintiff's credibility was flawed. The ALJ explicitly considered the infrequency of Plaintiff's medical treatment in assessing the limiting effects of his symptoms. Tr. at 23. SSR 96-7p makes it clear that the ALJ should not draw conclusion about a claimant's symptoms

and their functional effects from a failure to seek or pursue medical treatment without seeking explanation from the claimant.  The ALJ twice had the opportunity to question Plaintiff about his lack of treatment, but he failed to do so.  Upon remand, the ALJ should question Plaintiff and obtain additional evidence, if necessary, in order to determine Plaintiff's reasons for failing to seek or pursue regular medical treatment and should make a new credibility determination.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

August 12, 2014                                Shiva V. Hodges
Columbia, South Carolina                       United States Magistrate Judge